**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

LJ DOLIN,

      Plaintiff,

v.                                    Civ. No. 16-529 GBW/GJF

THYSSENKRUPP ELEVATOR CORP.,

      Defendant.

**ORDER GRANTING IN PART DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT**

      This matter comes before the Court on Defendant's Motion for Summary

Judgment. *Doc. 54.* Having reviewed the motion and attendant briefing (*docs. 55, 56*),

having presided over oral argument on the matter (*doc. 68*), and being otherwise fully

advised, the Court hereby GRANTS in part and DENIES in part summary judgment to

Defendant for the reasons described below.

## I.    BACKGROUND

      This case stems from allegations brought by Plaintiff regarding her employment

with Defendant as a female elevator mechanic from August 11, 2010 until February 4,

2016. *Doc. 1.* Plaintiff filed suit in this Court on June 6, 2016. *Id.* Specifically, Plaintiff

brought: (1) equal pay claims under the Equal Pay Act ("EPA"), the New Mexico Fair

Pay for Women Act ("FPWA"), and Title VII of the Civil Rights Act, (2) a retaliation

claim under Title VII,[1] and (3) a hostile work environment claim under Title VII. *Id.* Defendant filed a Motion to Dismiss on August 5, 2016. *Doc. 7.* Judge Armijo, on March 31, 2017, granted Defendant's Motion as to Plaintiff's hostile work environment claim, but denied the Motion in all other respects. *Doc. 18.* On March 30, 2018, Defendant filed the instant Motion for Summary Judgment. *Doc. 54.* The Motion was fully briefed on May 16, 2018. *Doc. 57.* The case was thereafter reassigned to the undersigned with the consent of the parties on September 30, 2018. *Doc. 60.* The Court heard oral argument on the Motion on November 19, 2018. *Doc. 68.*

## II.    LEGAL STANDARDS

### A.  SUMMARY JUDGMENT

Under Federal Rule of Civil Procedure 56(a), this Court must "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). *See also Kidd v. Taos Ski Valley, Inc.*, 88 F.3d 848, 851 (10th Cir. 1996). The movant bears the initial burden of "show[ing] 'that there is an absence of evidence to support the nonmoving party's case.'" *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891

---

[1] During the Motion Hearing, Plaintiff attempted to clarify that her Complaint also brings a retaliation claim under the FPWA. *See doc. 68* at 4. In addition, in her Response, Plaintiff similarly contends that her Complaint brings a retaliation claim under the EPA. *Doc. 55* at 19-22. However, Plaintiff included neither claim within the four corners of her Complaint, and never sought the Court's leave to amend her complaint to add these claims. *See generally, doc. 1.* Because Plaintiff failed to adequately plead retaliation claims under the EPA or the FPWA, Plaintiff may only seek recovery for retaliation under Title VII. *See Seaboard Air Line Ry. v. Renn*, 241 U.S. 290 (1916) (A plaintiff may not maintain a cause of action not raised in the operative complaint). *See also Pedroza v. Lomas Auto Mall, Inc.*, 600 F. Supp. 2d 1173 (D.N.M. 2009) (amendment is required to add new theories of liability).

(10th Cir. 1991) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).  Once the movant meets this burden, the non-moving party is required to designate specific facts showing that "there are . . . genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *see also Celotex*, 477 U.S. at 324.

## B. THE EQUAL PAY ACT ("EPA")

To establish a *prima facie* case of wage discrimination on the basis of sex under the EPA, Plaintiff "has the burden of proving that (1) she was performing work which was substantially equal to that of the male employees considering the skills, duties, supervision, effort and responsibilities of the jobs; (2) the conditions where the work was performed were basically the same; [and] (3) the male employees were paid more under such circumstances."  *Tidwell v. Fort Howard Corp.*, 989 F.2d 406, 409 (10th Cir. 1993) (citing *Corning Glass Works v. Brennan*, 417 U.S. 188 (1974)).

An employer has four affirmative defenses to an EPA claim.  *Washington Cnty. v. Gunther*, 452 U.S. 161, 169 (1981).  The Equal Pay Act provides: "[n]o employer … shall discriminate … between employees on the basis of sex by paying wages to employees … at a rate less than the rate at which he pays wages to employees of the opposite sex … for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii)

3

a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex." 29 U.S.C. § 206(d)(1).

To meet this burden, an employer must "submit evidence from which a reasonable factfinder could conclude not merely that the employer's proffered reasons *could* explain the wage disparity, but that the proffered reasons *do in fact* explain the wage disparity." *Mickelson v. N.Y. Life Ins. Co.*, 460 F.3d 1304, 1312 (10th Cir. 2006) (citation omitted). At the summary judgment stage, this means an employer must "prove at least one affirmative defense so clearly that no rational jury could find to the contrary." *Id.* at 1311 (citation omitted). As with cases under Title VII, the Court's role is to prevent unlawful employment practices, "not to act as a super personnel department that second guesses employers' business judgments." *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1233 (10th Cir. 2000) (cited with approval in *Casalina v. Perry*, 708 F. App'x 938, 942 (10th Cir. 2017)).

## C. THE NEW MEXICO FAIR PAY FOR WOMEN ACT ("FPWA")

The FPWA prohibits pay discrimination on the basis of sex. N.M. Stat. Ann. § 28-23-3. The FWPA is very similar to the EPA; however, it lacks the "catch-all" defense found in the EPA. The FWPA states:

> A. No employer shall discriminate… between employees on the basis of sex by paying wages to employees… at a rate less than the rate that the employer pays wages to employees of the opposite sex… for equal work on jobs the performance of which requires equal skill, effort and responsibility and that are performed under similar working conditions, except where the payment is made pursuant to a:

4

      (1) Seniority system;
      (2) Merit system; or
      (3) System that measures earnings by quantity or quality of production.

B. An employer shall not reduce the wage of an employee to comply with this section.

C. No agreement between the employer and an employee for a specific wage in violation of the Fair Pay for Women Act shall prevent the employee from raising a claim based on a violation of the Fair Pay for Women Act.

NMSA § 28-23-3.

### D. TITLE VII DISCRIMINATION

To prevail on her Title VII salary discrimination claim, Plaintiff must first establish a *prima facie* case of discrimination. *Ortega v. Safeway Stores, Inc.*, 943 F.2d 1230, 1236 (10th Cir. 1991); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). "[A] female Title VII plaintiff establishes a *prima facie* case of sex discrimination by showing that she occupies a job similar to that of higher paid males." *Sprague v. Thorn Americas, Inc.*, 129 F.3d 1355, 1363 (10th Cir. 1997) (quotation and citation omitted). If she succeeds in establishing a *prima facie* case, the burden shifts to Defendant to rebut the presumption of discrimination by "producing 'some evidence that it had legitimate, nondiscriminatory reasons[.]'" *Sorensen v. City of Aurora*, 984 F.2d 349, 352 (quoting *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 986 (1988)). This "burden is exceedingly light." *DePaula v. Easter Seals El Mirador*, 859 F.3d 957, 970 (10th Cir. 2017) (internal quotation and citation omitted). In addition, we do not consider "whether [Defendant's] proffered reasons were wise, fair or correct, but whether [it] honestly

believed those reasons and acted in good faith upon those beliefs." *Rivera v. City & Cnty. of Denver*, 365 F.3d 912, 924-25 (10th Cir. 2004).

If Defendant succeeds in rebutting the presumption of discrimination raised by Plaintiff's *prima facie* case, then "summary judgment is warranted unless the employee can show there is a genuine issue of material fact as to whether the proffered reasons are pretextual." *Plotke v. White*, 405 F.3d 1092, 1099 (10th Cir. 2005). "A plaintiff shows pretext by demonstrating 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence' and hence infer that the employer did not act for the asserted nondiscriminatory reasons." *Swackhammer v. Sprint/United Mgmt. Co.*, 493 F.3d 1160, 1167 (10th Cir. 2007) (quoting *Plotke*, 405 F.3d at 1102).

A common method of showing pretext is by arguing disparate treatment. *Id.* "Under this approach, a plaintiff can establish pretext by 'demonstrat[ing] that the employer treated the plaintiff differently from other similarly-situated employees[.]" *Herrera v. United Airlines, Inc.*, 2018 WL 5257501 (10th Cir. 2018) (unpublished) (quoting *Swackhammer*, 493 F.3d at 1167-68). "Similarly situated employees are those who deal with the same supervisor and are subject to the same standards governing performance evaluation and discipline." *Wilson v. Utica Park Clinic, Inc.*, 1996 WL 50462, at *1 (10th Cir. Feb. 7, 1996) (unpublished) (citing *Mazzella v. RCA Global Communications, Inc.*, 642

F. Supp. 1531, 1547 (S.D.N.Y. 1986), *aff'd*, 814 F.2d 653 (2d Cir.1987)); *see also Aramburu v. Boeing Co.*, 112 F.3d 1398, 1404 (10th Cir. 1997).

### E. TITLE VII RETALIATION

To sustain a *prima facie* claim of retaliation, a plaintiff must demonstrate "(1) that [s]he engaged in protected opposition to discrimination, (2) that a reasonable employee would have found the challenged action materially adverse, and (3) that a causal connection existed between the protected activity and the materially adverse action." *EEOC v. Wal-Mart Stores, Inc.*, 576 F. Supp. 2d 1240, 1243 (D.N.M. 2008) (quoting *Argo v. Blue Cross Blue Shield of Kansas, Inc.*, 452 F.3d 1193, 1202 (10th Cir. 2007)). "A causal connection may be shown by 'evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action.'" *O'Neal v. Ferguson Const. Co.*, 237 F.3d 1248, 1253 (10th Cir. 2001) (quoting *Burrus v. United Tel. Co. of Kan., Inc.*, 683 F.2d 339, 343 (10th Cir. 1982). "Unless there is very close temporal proximity between the protected activity and the retaliatory conduct, the plaintiff must offer additional evidence to establish causation." *Id.* If Plaintiff succeeds in sustaining a *prima facie* claim, the burden then shifts to Defendant "to articulate a legitimate, nondiscriminatory reason for the [materially adverse action.]" *Argo*, 452 F.3d at 1202. Thereafter, Plaintiff must "demonstrate that the proffered explanation is a pretext for retaliation." *Id.* at 1203.

## III. FACT SUMMARY

Based on the facts presented by the movants and other facts gleaned from the record, the Court finds the following material facts undisputed:

1. Defendant ThyssenKrupp Elevator Co. ("TKE") manufactures, installs and services elevators throughout the United States. *Doc. 54-9* at 1.

2. Defendant employed Plaintiff, a lesbian woman, in Roswell, New Mexico as a Local Representative ("LR")[2] Service Mechanic in Local 131 from December 15, 2008 to March 5, 2010 and from August 11, 2010 until February 4, 2016.[3] *Doc. 1* at 2.

3. During her employment, Plaintiff was the sole TKE elevator mechanic within a three hundred square mile area from Roswell. *Doc. 1* at 3. Plaintiff was required to be on call 24/7 and to respond to client calls within two hours. *Id.*

4. A collective bargaining agreement between Defendant and IUEC determined Plaintiff's hourly rate of pay, known as union scale. *Doc. 1* at 3.

5. On December 17, 2008, Defendant, Plaintiff, and IUEC signed a written agreement stipulating that Defendant would pay Plaintiff union scale and a 6% plus rate[4]

---

[2] The LR designation indicates that the employee works outside of the primary jurisdiction of a Local. *Doc. 54-9* at 2.

[3] Local 131 is the division of the International Union of Elevator Constructors ("IUEC") covering the Albuquerque and El Paso branches of TKE. *Doc. 68* at 4.

[4] A National Labor Relations Board advice memorandum explained plus rates in the elevator industry as follows:

> Employees may also receive plus pay pursuant to "[LR] agreements," in which local management and Union locals negotiate moving expenses, as well as extra benefits and pay for employees who agree to work in service areas where the employer lacks a facility. . . . [E]mployers often directly negotiate with employees to establish individual plus pay rates based on the employer's assessment of an employee's merit/performance,

during a six-month probationary period and a 12.5% plus rate thereafter. *Doc. 1* at 4; *doc. 54-12* at 1.

6. Defendant reviews all plus rates annually to determine whether to eliminate a plus rate or red-circle[5] an employee's pay. *Doc. 54-1* at 10.

7. Throughout Plaintiff's employment with Defendant, the managerial department experienced significant turnover. In the El Paso Branch Service Manager position, William Morgan served in 2008, Doug Roach served from October 2009 until April 2011, and Carlos Trujillo served from July 2011 until September 2016. *Doc. 54-1* at 10 n.2. In the El Paso Branch Manager position, Harold Carr served from October 2008 until October 2010, James Jasinski served from January 2011 until February 2014, and Neil Marshall served from June 2015 until February 2016. *Id.* From March 2009 until May 2012, Gary Dodd oversaw the El Paso Branch as Albuquerque District Manager. *Id.*

8. When hired by Defendant, Plaintiff replaced a male LR, Steve Evarts, who had been paid a 12.5% plus rate to cover the same route assumed by Plaintiff. *Doc. 1* at 4.

---

an employee's assignment to a particular job or job function, or in order to recruit and/or retain skilled employees.

*Doc. 54-11* at 2.

[5] Red-circling, otherwise known as a "pay freeze[,]" causes an employee's wage to "be frozen so the prevailing wage will catch up…to the point where [the employee's salary] will be at the negotiated prevailing wage rate." *Doc. 54-4* at 9-10; *doc. 54-5* at 31. Direct supervisors generally make red-circling determinations. *Doc. 54-5* at 31.

9. On January 27, 2010, Doug Roach, the El Paso Branch Service Manager, issued an unsatisfactory performance letter to Plaintiff alleging that Plaintiff failed to diagnose a problem, complete a work order, and timely notify Defendant, which caused Defendant to dispatch another employee to the facility the following day. *Doc. 54-15* at 1. Plaintiff delivered a rebuttal letter to Defendant on January 29, 2010. *Id.* at 2-4.

10. On February 16, 2010, Doug Roach completed Plaintiff's employee evaluation, finding her equipment knowledge and quality of work below average. *Doc. 54-16*.

11. On March 3, 2010, Doug Roach issued a termination letter to Plaintiff in which he explained that Plaintiff had failed to advise Defendant, prior to taking vacation on February 21, 2010, that her monthly maintenance visit to Cannon Air Force Base needed to be covered in her absence. In addition, he cited an incident in which Plaintiff raised her voice and closed a door in the face of a customer. *Doc. 54-13*.

12. On March 5, 2010, Defendant terminated Plaintiff. *Doc. 1* at 4; *doc. 54-13*.

13. Defendant rehired Steve Evarts to replace Plaintiff and provided him a 12.5% plus rate. *Doc. 1* at 4.

14. On April 16, 2010, Plaintiff filed charges with the New Mexico Department of Workforce Solutions & Human Rights Bureau and the U.S. Equal Employment Opportunity Commission ("EEOCC"), alleging wrongful termination involving discrimination based on sex and sexual orientation. *Doc. 1* at 2.

15. On August 11, 2010, pursuant to a settlement agreement in which Plaintiff agreed to

    withdraw her grievances, *doc. 54-14* at 4-5, Defendant reinstated Plaintiff to her old

    route.  All parties agreed that she would be paid the "prevailing negotiated

    Mechanic's wage rate of IUEC Local 131[,]" meaning she would not receive any plus

    rate.  *Id.* at 4; *doc. 54-1* at 12.  In addition, Defendant paid Plaintiff $29,266.00,

    replaced the termination letter and January 2010 performance warning with a

    performance expectations document, and promised to provide her with training.

    *Doc. 54-1* at 12; *doc. 54-15*.[6]

16. On December 27, 2010, Gary Dodd, the Albuquerque District Manager, issued a

    performance letter to Plaintiff, noting that several customers had contacted

    Defendant to comment on Plaintiff's poor customer relations skills and improper

    parking.  In addition, Dodd explained that Plaintiff had repeatedly failed to follow

    up with or properly communicate with the office.  *Doc. 54-22.*

---

[6] Jack Upchurch explained the settlement negotiations during his deposition:

> When we met … at the Local 131 hall here in Albuquerque, Ms. Dolin was present, along
> with John McNerney, along with the business agent for Local 131 at the time.  And Mr.
> Dodd … was there with me, as well as Harold Carr and Doug Roach.  [. . .]  At some
> point … Mr. McNerney and I broke off separately from the group . . . .  Mr. Dodd and I,
> then, had further conversations, along with Harold Carr and Doug Roach. . . .it was
> agreed to that we would return LJ Dolin to her position as the remedy of the grievance.
> Insistent … was the theme that we believe the performance issues that brought us to that
> point that day, and the termination of LJ Dolin, continued, and that she was not well
> placed as an LR alone in an area.  And, therefore, we didn't believe that a plus rate,
> which would normally be given to someone in a scenario like that[, was warranted.]"
> *Doc. 55-2* at 2.

Gary Dodd confirmed in his deposition that he, Jack Upchurch, Harold Carr and Doug Roach jointly
decided during negotiations to remove Plaintiff's plus rate upon reinstatement.  *Doc. 54-4* at 38-39.

17. On March 24, 2011, James Jasinksi, the El Paso Branch Manager, issued Plaintiff a performance letter, advising Plaintiff to treat customers with respect, communicate professionally, promptly notify the office of customer relations issues, and to work assigned hours. *Doc. 54-24.*

18. Defendant sent Plaintiff to Albuquerque for training from April 4 to July 1, 2011. *Doc. 54-23.*

19. On May 29, 2012, Carlos Trujillo, the El Paso Service/Operations Manager, issued Plaintiff a performance letter for working unauthorized overtime. *Doc. 54-26* at 1. Plaintiff submitted a rebuttal letter on June 10, 2012. *Doc. 54-26* at 2-3. On November 7, 2012, Carlos Trujillo issued Plaintiff another performance warning for working unauthorized overtime. *Doc. 54-27.* On December 20, 2012, Plaintiff filed an IUEC grievance form in response, noting that she had made several efforts to reach her supervisor to obtain permission to work overtime and had received no response, and that others had worked overtime in similar situations without consequence. *Doc. 54-27* at 2.

20. On November 18, 2012, Plaintiff requested in writing that a plus rate be reinstated into her salary. *Doc. 68* at 2. Jack Upchurch, on behalf of Defendant, denied the request. *Id.* at 2-3.[7]

---

[7] The parties agree that Jack Upchurch was involved in each decision regarding the status of Plaintiff's salary following her reinstatement. *Doc. 68* at 3. Particularly, even though the operating group, comprising the branch manager and operating managers in El Paso, were generally responsible for hiring

21. On July 1, 2013, Plaintiff asked again in writing to negotiate the plus rate back into her pay, but Defendant declined, citing her poor performance.  *Doc. 54-1 at 17*; *doc. 54-38 at 10.*

22. On July 23, 2013, Defendant issued Plaintiff a performance letter after she provided elevator shaft access to a non-TKE employee without first obtaining company approval.  *Doc. 54-1 at 16.*

23. On January 3, 2014, Plaintiff filed charges with the New Mexico Department of Workforce Solutions and the EEOC alleging that Defendant committed sex discrimination, violations of the Equal Pay Act, and unlawful retaliation.  *Doc. 1 at 2.*

24. In February 4, 2016, Plaintiff voluntarily transferred from Roswell to a non-LR position in California, which did not qualify for a plus rate.  *Doc. 54-1 at 17.*

25. On March 29, 2016, Defendant hired John Boutte to replace Plaintiff in the Roswell position.  *Doc. 54-33.*  Defendant compensated Mr. Boutte with a 30% plus rate.  *Id.*

26. On March 9, 2016, the EEOC issued a Notice of Right to Sue to Plaintiff.  *Doc. 1 at 2.*

27. Plaintiff resigned from Defendant's employ effective March 1, 2017.  *Doc. 54-32.*

---

and determining salary for TKE LRs employed in Roswell, in this case, following Plaintiff's termination, the "higher-ups" in the TKE labor and relations team were always involved.  *Id.*

IV.    ANALYSIS

A.    THE COURT GRANTS DEFENDANT SUMMARY JUDGMENT ON PLAINTIFF'S
CLAIM FOR WAGE DISCRIMINATION ON THE BASIS OF SEX UNDER THE EPA,
BECAUSE EVEN THOUGH PLAINTIFF MAKES A *PRIMA FACIE* SHOWING OF
DISCRIMINATION, DEFENDANT HAS SUCCESSFULLY DEMONSTRATED THAT
PLAINTIFF'S PAY DIFFERENTIAL WAS BASED ON HER PERFORMANCE
PROBLEMS, A FACTOR OTHER THAN SEX.

In count one of her Complaint, Plaintiff brings a claim for sex discrimination

pursuant to the EPA, stating that "Defendant…intentionally and willfully fail[ed] to

equally pay Plaintiff for work equal to that or substantially equal to that of male LR

Service Mechanics employed by Defendant" by withholding the 12.5% plus rate from

her paychecks from August 2010 through February 2016.  *Doc. 1* at 7.

1. Plaintiff makes a *prima facie* case of EPA wage discrimination based on
sex.

When considering this claim on summary judgment, the Court must first

determine whether Plaintiff establishes a *prima facie* case of wage discrimination.  To

establish her *prima facie* case of wage discrimination on the basis of sex under the EPA,

Plaintiff must prove that (1) she performed substantially equal work; (2) under basically

the same working conditions; and (3) male employees were paid more under such

circumstances.  *Tidwell,* 989 F.2d at 409 (citing *Corning Glass Works,* 417 U.S. at 188.).[8]

_____

[8] Certain cases have also held that proper comparators under the EPA must also work in the "same
establishment[,]" meaning employees must be subject to "centralized control of job descriptions, salary
administration, job assignments, or functions." *Thompson v. City of Albuquerque,* 950 F. Supp. 1098, 1102
(D.N.M. 1996).  However, Plaintiff makes no such argument.  In addition, Plaintiff contends that all LRs
in the Albuquerque and El Paso region, not just Roswell LRs, are proper comparators for Plaintiff's EPA
claim, demonstrating that she does not clearly rely on the "same establishment" criterion in selecting her

"Under the EPA, the first step is to identify [] comparators whose jobs may be analyzed to determine whether they are substantially equal. In selecting comparators, plaintiff must show that at least one specific employee of the opposite sex earned higher wages for a substantially equal job. [ . . .] Plaintiff's choice of specific comparators should be scrutinized to determine its usefulness." *Mehus v. Emporia State Univ.*, 222 F.R.D. 455, 473 (D. Kan. 2004) (citing *Hein v. Or. Coll. Of Educ.*, 718 F.2d 910, 916 (9th Cir. 1983) (finding the plaintiff's sole comparator unreasonable where the plaintiff chose only the highest paid male employee)). Here, Plaintiff points to male LRs in Local 131, comprising the Albuquerque and El Paso branches of TKE, as comparators under the EPA. *Doc. 68* at 3. Particularly, Plaintiff notes, "[f]acts show that [Plaintiff] was paid less than Steve Evarts, prior and interim Roswell LR, John Boutte, subsequent Roswell LR, and Clark Nelson, Las Cruces LR." *Doc. 55* at 15. In support, she explains that from August 2010 through February 2016, TKE paid Plaintiff the prevailing union scale rate; meaning, her salary did not include a plus rate. *See doc. 54-14* at 4-5. In contrast, TKE compensated Steve Evarts and Clark Nelson with a 12.5% plus rate, (*docs. 54-36* at 37, *55* at 10), and John Boutte with a 30% plus rate, *doc.* 54-36 at 75. In other terms, TKE paid Clark Nelson and Steve Evarts approximately $41.89 per hour, and Boutte

---

comparators. *Doc. 68* at 3. Nevertheless, even if Plaintiff did rely on an "establishment" argument, when looking to TKE, in which central administrative units approve the hiring of and compensation rates for employees, the court may properly consider separate work sites to be part of one establishment, because courts look to "whether there existed centralized control and administration of disparate job sites[,]" not mere geographic location. *Thompson*, 950 F. Supp. at 1102 (citations omitted).

approximately $50.80 per hour, whereas TKE compensated Plaintiff only $37.24 per hour. *Doc. 54-36* at 37, 75. However, Defendant disagrees that only Local 131 employees are proper comparators under the EPA. *See doc. 68* at 3. Instead, Defendant argues that LRs throughout TKE's employ nationwide perform substantially equal work under basically the same conditions as Plaintiff and therefore constitute the proper universe of comparators. *Id*. Given this disagreement, the Court must determine whether TKE LRs nationwide perform substantially equal work under similar conditions to Plaintiff such that they constitute a more appropriate comparator group for Plaintiff's EPA claim.

Work is "substantially equal" for purposes of the EPA if it requires "equal skill, effort, and responsibility." *Riser*, 776 F.3d at 1195 (quoting 29 U.S.C. § 206(d)(1)). "Skill includes such considerations as experience, training, education, and ability. Effort refers to the physical or mental exertion necessary to [perform] a job. Responsibility concerns the degree of accountability required in performing a job. Substantial equality is not a factor of job titles or classifications but rather of actual requirements and performance of the job." *Thompson v. City of Albuquerque*, 950 F. Supp. 1098, 1103 (D.N.M. 1996) (quotations and citations omitted). "The issue whether two or more jobs require equal work in EPA terms is decided on a case-by-case basis." *Brickey v. Employers Reassurance Corp.*, 293 F. Supp. 2d 1227, 1230 (D. Kan. 2003) (quotation and

citations omitted).  "The relevant comparison is between the jobs and not the people holding them."  *Id*. (quotation and citation omitted).

Here, Plaintiff and all LRs nationwide employed by TKE are represented by the International Union of Elevator Constructors ("IUEC"), which negotiates a collective bargaining agreement with TKE that governs LR union scale hourly wages and employment.  *Doc. 54-10* at 2.  Regarding skill and responsibility, all TKE LRs perform contract work as elevator mechanics, including inspections, maintenance and repair for TKE clients in "a city outside the primary of a local union[,]" meaning, within remote areas.  *See generally, doc. 54-10*.  TKE LRs are also expected to contribute considerable effort, are "on call for extended periods of time," except during limited weekends upon request, and must respond to call-backs after hours.  *Id*. at 2.  Considering the practically identical skill, effort, and responsibility required of all TKE LRs, the Court finds that Plaintiff's position was substantially equal to that of TKE LRs nationwide.

 Looking to the second prong, working conditions, "[g]enerally, employees performing jobs requiring equal skill, effort, and responsibility are likely to be performing them under similar working conditions."  *Mehus*, 222 F.R.D. at 476.  The Supreme Court has explained that the working conditions factor includes two subparts: surroundings and hazards.  *See Corning Glass Works*, 417 U.S. at 202 ("'Surroundings' measures the elements, such as toxic chemicals or fumes, regularly encountered by a worker, their intensity, and their frequency.  'Hazards' takes into account the physical

hazards regularly encountered, their frequency, and the severity of injury they can cause"). Plaintiff, while arguing that she experiences different working conditions as a TKE Roswell LR than TKE LRs nationwide, does not contend that she encounters different surroundings or hazards, but rather maintains that having the same supervisor under the same organizational structure is significant to the 'similar working conditions' analysis under the EPA. *Doc. 68* at 3. Plaintiff does not point the Court to any authority supporting her reading and the Court is unpersuaded these considerations are relevant under the EPA "working conditions" factor as explained in *Corning Glass Works*. For these reasons, the Court finds that LRs throughout TKE's employ nationwide are proper comparators, because their positions are substantially equal and involve basically the same working conditions as the position held by Plaintiff as an LR in Roswell, New Mexico. Furthermore, the Court determines that TKE LRs nationwide constitute more appropriate comparators than the needlessly narrow Local 131 group proposed by Plaintiff.[9]

Since the Court has already determined that Plaintiff's comparators, TKE LRs in the United States, performed substantially equal work under similar working conditions, thereby addressing the first two prongs of the *prima facie* analysis, the Court

---

[9] The more inclusive group of comparators is particularly appropriate because Plaintiff repeatedly uses data outside Local 131 to support her own showing of wage discrimination. *See doc. 55* at 17 (explaining that "work responsibilities and conditions of the Roswell route and the 24/7 on-duty and call back time limits were the same as the other *Southwest Region*, IUEC LR routes held by men, but only [Plaintiff] was denied the LR plus rate") (emphasis added).

must now determine whether Plaintiff established that male LRs employed by TKE nationwide received higher pay than Plaintiff. The proper test is whether Plaintiff was "paid less than most of [the male comparators.]" *Allen v. Sulzer Chemtech USA, Inc.*, 289 F. App'x 278, 281 (10th Cir. 2008)(unpublished). Looking to the TKE LR salary data, the Court finds that Plaintiff has demonstrated that she was paid less than most male LRs. *See generally doc. 54-36.* As a result, the Court finds that Plaintiff has made a *prima facie* showing of wage discrimination on the basis of sex under the EPA.

### 2. Defendant makes a successful affirmative defense by proving that Plaintiff's wage differential was based on a factor other than sex.

The burden now shifts to Defendant, who may make four affirmative defenses to Plaintiff's *prima facie* case. *Gunther*, 452 U.S. at 169. Specifically, an employer wins on summary judgment where it can clearly prove that the wage differential is in fact based on "(i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex." 29 U.S.C. § 206(d)(1); *Riser*, 776 F. 3d at 1196. Defendant "must prove at least one affirmative defense so clearly that no rational jury could find to the contrary." *Mickelson*, 460 F.3d. at 1311 (quotation and citation omitted).

In making her EPA claim, Plaintiff argues that the wage discrimination she experienced while employed by Defendant can be divided into two distinct categories: (1) discrimination arising from the removal of her plus rate on August 11, 2010 and (2) discrimination resulting from Defendant's refusal to reinstate Plaintiff's plus rate

following Plaintiff's written request on November 18, 2012.  *Doc. 68* at 1-2.

        **a.  Defendant demonstrates that the pay disparity experienced by Plaintiff upon reinstatement on August 11, 2010 was based on a factor other than sex.**

In making its affirmative defense to the first category of discrimination, Defendant states that it removed Plaintiff's plus rate from her salary based on a factor other than sex.  "'Factors other than sex' is a broad principle which explicitly states that a differential based on factors other than sex does not violate the EPA."  *Mehus*, 222 F.R.D. at 477 (citing *Gunther*, 452 U.S. at 171 n.11).  *See also* H. R. Rep. No. 309, 88th Cong., 1st sess. 3, *reprinted in* 1963 U.S.C.C.A.N. 687, 689) ("As it is impossible to list each and every exception, the broad general exclusion [, the "factors other than sex" affirmative defense,] has also been included").

Defendant removed Plaintiff's plus rate pursuant to the conditions of the August 11, 2010 Settlement Agreement that reinstated Plaintiff's employment following her March 5, 2010 termination.  *Doc. 54-14* at 4-5; *doc. 56* at 5.  Defendant explains that it negotiated the removal of Plaintiff's 12.5% plus rate as a term of the agreement to address its remaining concerns regarding her poor performance that it contends precipitated her termination.  *Doc. 55-2* at 2; *doc. 54-4* at 38-39.  Plaintiff responds that, although she willingly and knowingly agreed to removal of her plus rate following

extended negotiations,[10] the existence of the 2010 Settlement Agreement does not

establish that Defendant relied on a factor other than sex in removing Plaintiff's plus

rate. *Doc. 55* at 18-19. She explains, "the mere existence of a wage agreement cannot be

considered a 'factor other than sex' if the contract perpetuates pay differentials which

would themselves violate the [Equal Pay] Act." *Id.* (quoting *Anderson v. Univ. of N.*

*Iowa*, 779 F.2d 441, 444 (8th Cir. 1985)); *see also Dean v. United Food Stores, Inc.*, 767 F.

Supp. 236, 240 n. 1 (D.N.M. 1991) ("A person is not precluded from bringing a claim

under the Equal Pay Act because he or she has agreed by contract to a certain level of

pay.") (citing *Anderson*, 779 F.2d at 444).

Even if the 2010 Settlement Agreement were indistinguishable from the collective

bargaining and general employment agreements in *Anderson* and *Dean*, *see* 779 F.2d at

444; 767 F. Supp. at 239,[11] the fact that a plaintiff agreed to a lesser wage than her

counterparts is a defense to a sex discrimination charge "where any resulting difference

in pay is rooted in legitimate business[.]" *Riser*, 776 F,3d 1191, 1198 (internal quotations

and citations omitted). Here, Defendant does not justify Plaintiff's pay differential with

the *mere* existence of a wage agreement, but instead demonstrates that the inclusion of

the salary term in a Settlement Agreement, negotiated in good faith, was a legitimate

---

[10] Plaintiff concedes that she knew, when signing the settlement agreement, that she would not receive a plus rate upon reinstatement. However, she argues that she did not, in signing the agreement, waive her right to receive a plus rate thereafter. *Doc. 68* at 2.
[11] The Court need not and does not decide that question here.

business decision rooted in Plaintiff's performance problems prior to her termination, a factor other than sex. *Doc. 68* at 2-4. *See Klindt v. Honeywell Intern. Inc.*, 303 F. Supp. 2d 1206, 1221 (D. Kan. 2004) (finding skill to be a factor other than sex); *Casalina v. Perry*, 708 F. App'x 938, 941 (noting that a "pay-for-performance system," which does not entail "sex discrimination as a purpose or as an effect," does not violate the EPA and constitutes a factor other than sex); *Brownlee v. Gay and Taylor, Inc.*, 642 F. Supp. 347, 362 (D. Kan. 1985) (holding that, because the defendant based its salary program on "performance[, t]he salary system clearly was based on *factors other than sex* … thus falling within the fourth exemption … to the Equal Pay Act.").

Defendant cites to significant evidence showing that Plaintiff's performance problems prior to her termination on March 5, 2010, justifying Defendant's concern in rehiring her and their decision to remove her plus rate. For example, Defendant reveals that on January 27, 2010, Doug Roach issued Plaintiff an unsatisfactory performance letter. *Doc. 54-15* at 1. The letter memorialized the fact that on January 18, 2010, Plaintiff failed to diagnose and resolve a problem on the elevator car for which a work order had been issued at Eastern New Mexico University. *Id*. at 1-4. In addition, her efforts somehow caused the second and only other functional elevator car in the building to cease operations. *Id*. These issues were exacerbated by Plaintiff's failure to timely notify Defendant until 5:30 p.m. that evening. *Id.* As a result, the elevators remained non-operational the evening before student move-in day, leading to immense

customer dissatisfaction, and requiring Defendant to dispatch another employee on overtime to the facility the following day, costing the company "great expense and inconvenience[.]" *Id.* at 1. In the letter to Plaintiff, Defendant stated:

> Your lack of performance as described above is further evidence of your inability to perform your job at the level necessary in order to meet the expectations of ThyssenKrupp Elevator and those of our customers. […] Accordingly, this letter is placing you on notice that you are being given a final opportunity to improve your performance and that your improvement must be immediate and sustained. If such improvement is not immediately forthcoming, we will have no alternative other than to terminate your [employment.] We stand ready to assist you…in bringing your performance to the level expected of each of our employees.

*Id.*[12] Despite this warning, Plaintiff's performance remained unsatisfactory, and Plaintiff's February 16, 2010 employee evaluation found her performance below average. *Doc. 54-16*.

Finally, on March 3, 2010, Doug Roach issued an unsatisfactory performance termination letter to Plaintiff in which he explained that Plaintiff had failed to advise Defendant, prior to taking vacation on February 21, 2010, that her monthly maintenance visit to Cannon Air Force Base would need to be covered in her absence, resulting in a

---

[12] Plaintiff submitted a rebuttal to the performance letter. *Doc. 54-15* at 2-4. However, in the letter, she does not dispute that she failed to diagnose the first elevator car's problem, the second elevator car shut down while she performed maintenance on the first elevator car, she did not contact Doug Roach until after business hours to inform him of the problem, and Defendant sent out a second elevator mechanic the following day to address the problem. *Id.* Rather, she complains about her training, notes that Defendant sent out a second elevator mechanic to the site on overtime, costing Defendant more, contends she performed reasonably under the circumstances, and blames the customer for waiting a week after the first elevator shut down before filing a work order. *Id.* This rebuttal letter, in itself, demonstrates Plaintiff's failure to accept responsibility for her actions and lack of motivation to improve her performance to meet Defendant's expectations.

missed service visit for which Defendant was required to reimburse the customer.  *Doc. 54-13*.  In addition, he cited another February incident, which he had previously discussed with Plaintiff, in which Plaintiff raised her voice and shut a door in the face of a customer in response to her frustration and inability to diagnose and fix the customer's elevator.  *Id.*

In sum, because Plaintiff's performance continued to fall short of Defendant's standards despite warnings, Defendant terminated Plaintiff's employment as of March 5, 2010.  *Id.*  Jack Upchurch testified that "[i]n the negotiations to return her to work it was still very clear, and [Defendant] made it very clear, that we had concerns about her performance and her ability to perform in that position."  *Doc. 54-1* at 13.  "[T]herefore, we didn't believe that a plus rate, which would normally be given to someone in a scenario like that[, was warranted.]"  *Doc. 55-2* at 2.  Gary Dodd additionally confirmed that Plaintiff was terminated due to poor performance, including her continual failure to get elevators back online and "constant" need for support from other elevator mechanics.  *Doc. 54-5* at 7-8.  He subsequently clarified that he, Jack Upchurch, Harold Carr and Doug Roach jointly decided during negotiations to remove Plaintiff's plus rate upon reinstatement to address their remaining concerns about her ability to meet TKE standards.  *Doc. 54-5* at 32-34.  *See Lewis v. D.R. Horton, Inc.*, 375 F. App'x 818, 825-38 (10th Cir. 2010) (unpublished) (salary negotiation, market conditions, work history, and skills were legitimate reasons for pay disparity under Title VII).  Finally, it is

undisputed that Defendant removed the plus rates of poorly performing employees as a common disciplinary practice, underscoring that the decision to remove Plaintiff's plus rate was neither unique nor a remedy applied only to female employees.  *See doc. 54-37*.[13]

Overall, looking to this evidence, Defendant has clearly demonstrated that the removal of Plaintiff's plus rate upon reinstatement, pursuant to the settlement agreement, was "based on legitimate business purposes"—specifically, Plaintiff's performance problems.  *Dolin*, 2017 WL 1551990, at * 11.  Even if the Court were to question the fairness of the removal of Plaintiff's plus rate, the Court's role "is to prevent unlawful [employment] practices, not to act as a super personnel department that second guesses employers' business judgments."  *Kendrick*, 220 F.3d at 1233 (cited with approval in *Casalina*, 708 F. App'x at 942).  Further, Plaintiff does not dispute that the removal of Plaintiff's plus rate on reinstatement was in response to her performance issues.  *Doc. 68* at 4.  In addition, Plaintiff concedes that she voluntarily agreed to forego the plus rate in order to regain her job, receive a lump sum payment, and have

---

[13]  In its Motion, Defendant provides examples of incidents in which it removed plus rates from male employees.  *Doc. 54-37*.  Defendant removed the plus rate of Daron Drake, an LR in Illinois, after he left an unprofessional note under the blade of an individual's car which occupied the parking spot where his vehicle had been towed during a maintenance visit.  *Id*. at 1.  Phil Compton, an LR in Wyoming, lost his plus rate after he repeatedly failed to perform maintenance visits for a customer.  *Id*. at 2.  Defendant removed the plus rate of Zack Mackey, an LR in Washington, after he falsified a timesheet.  *Id*. at 3.  Finally, Mike Scammel, an LR in Texas, lost his plus rate after being removed from jobsites due to negative customer service interactions.  *Id*. at 4.  Rather than losing her plus rate after an isolated incident like Daron Drake or Zack Mackey, or after repeated offenses like Phil Compton or Mike Scammel, Plaintiff lost her plus rate only after a negotiated reinstatement, following a period in which her work suffered from a pattern of performance and customer service issues.

disciplinary letters removed from her personnel file to settle a grievance she was not sure she would win.  *Doc. 54-1* at 28.  Therefore, Defendant has unequivocally shown that the pay disparity experienced by Plaintiff upon reinstatement was based on a factor other than sex.

> **b.  Defendant demonstrates that the pay disparity experienced by Plaintiff due to Defendant's refusal to reinstate Plaintiff's plus rate, beginning on November 18, 2012, was based on a factor other than sex.**

In making its affirmative defense to the second alleged category of discrimination, Defendant states that it based its decision to deny Plaintiff's plus rate requests on a factor other than sex, namely Plaintiff's continued performance issues. *Doc. 68* at 5.  Defendant cites to overwhelming evidence that Plaintiff's performance repeatedly suffered following her reinstatement on August 11, 2010, justifying Defendant's decision to refuse Plaintiff's requests for plus rate compensation.

First, on December 27, 2010, Gary Dodd issued a performance letter to Plaintiff. *Doc. 54-22*.  In the letter, Dodd noted that several customers had contacted Defendant to complain about Plaintiff's poor customer relations skills, including her "uncooperative demeanor and non-professional manner[.]" *Id.* at 2.[14]  Dodd explained that Plaintiff had also failed to follow up with the office regarding a quote that a customer requested and

---

[14] One customer complained that Plaintiff accused them of damaging their own elevator.  *Doc. 54-21* at 2. The customer informed TKE that "[o]ur [] guests expect and deserve working mechanical equipment, not being trapped in an elevator or getting a bumpy ride," and revealed "[our Roswell general manager] is very frustrated as is [our Clovis manager.]" *Id.*

accused the customer of lying when confronted about it. *Id.* In addition, the letter explained that Plaintiff purchased materials without office approval, failed to keep the office apprised of her progress on calls, delayed hours in responding to calls, and disregarded her manager's instructions. *Id.* at 3. In an effort to address Plaintiff's shortcomings, the letter provided Plaintiff with detailed guidance regarding work expectations and how to meet them, and explained that Defendant was prepared to assist Plaintiff in bringing her performance up to par. *See generally id.*

Despite this guidance and oversight, Plaintiff received another performance letter on March 24, 2011 from James Jasinksi, advising Plaintiff to treat customers with respect, communicate professionally, promptly notify the office of customer relations issues, and to work assigned hours. *Doc. 54-24.* The letter also notified Plaintiff that her poor customer relations skills had caused a customer to terminate their contract with TKE. *Id.* at 1. In an effort to improve Plaintiff's performance, Defendant sent Plaintiff to training in Albuquerque from April 4 to July 1, 2011. *Doc. 54-23.* However, the training manager found that Plaintiff "had significantly more trouble than most in understanding [how the equipment operates.]" *Id.* at 4. After returning from training, Plaintiff showed little improvement, and Defendant began receiving customer complaints about Plaintiff once more. *Doc. 54-25.*[15] Furthermore, on May 29, 2012 and

---

[15] In an email, a customer described Plaintiff as an "out and out rude technician to work with," and noted that "[h]er ability to understand and trouble shoot … w[as] obviously limited and … much of the technician's energy was focused on placing blame. . . . This leaves me feeling that Roswell has not

November 7, 2012, Carlos Trujillo issued Plaintiff performance letters for working

unauthorized overtime. *Docs. 54-26, 54-27.*[16] Despite Plaintiff's repeated performance

issues, she requested in writing that her 12.5% plus rate be reinstated into her salary on

November 18, 2012. *Doc. 68* at 2. Jack Upchurch, on behalf of Defendant, denied the

request. *Id.* at 3.

Thereafter, Plaintiff's poor customer service skills continued to strain TKE-

customer relationships[17] and caused TKE to lose customers, including a customer in

Alamogordo who refused to allow Plaintiff back on site due to her rudeness. *Doc. 54-29*

at 1.[18] Plaintiff also repeatedly missed work and called in sick when Defendant denied

her requests for leave. *Id.* Plaintiff's work absences and irresponsibility created backlog

and obstacles for Defendant. As Neil Marshall explained: "On the afternoon of 11-19

[Plaintiff] requested vacation for 11-24. We already have two mechanics off that day, so

we denied her request. As predicted, she called in sick. . . . Currently, there are two

trouble calls in [Plaintiff's] territory that I can't spare mechanics for, one of which she

was aware of yesterday and subsequently left hanging." *Id.* In sum, from her

---

partnered with [the] right support company. This technician left me feeling that ThyssenKrupp []
appears to be uninterested in servicing the YUCCA elevators, [and] the competency of the technician
staff, as represented today, appears [] grossly inadequate." *Doc. 54-25* at 2.

[16] Nevertheless, Plaintiff continued to perform unauthorized overtime following these warnings. *Doc. 54-28* at 1.

[17] Plaintiff admitted to having "raised voice" exchanges with customers. *Doc. 54-29* at 2.

[18] The animosity between Plaintiff and this customer created a considerable problem for Defendant,
because Plaintiff was the only elevator mechanic employed by TKE serving the Alamogordo region.
Because Defendant could not send a substitute mechanic to that customer's location, Defendant lost that
client as a customer. *See doc 54-29.*

reinstatement on August 11, 2010 until her transfer on February 4, 2016, Plaintiff was an unreliable employee with performance (including customer service) problems, which she failed to improve.

Plaintiff does not contest the vast majority of these performance problems and does not show that male LRs who received plus rates suffered from comparable performance issues. *Doc. 68* at 5. On the other hand, Defendant has shown that it also employed male LRs—including Charles Graham, a male LR serving the same Local as Plaintiff—who were not compensated with plus rates. *Doc. 68* at 5. *See also doc. 54-36* at 31. Notably, Charles Graham was employed without a plus rate from the onset of his employment until 2015, supporting Defendant's contention that Defendant did not reinstate Plaintiff's plus rate because it did not believe that such payment was warranted in light of Plaintiff's performance, and proving false Plaintiff's claim that all LRs receive a plus rate automatically when employed, and Plaintiff was only refused what she was owed because of her sex. *See doc. 68* at 4-5.

Looking to the evidence, the Court finds that Defendant has clearly proven that Plaintiff's wage differential, resulting from Defendant's refusal to reinstate Plaintiff's plus rate from November 18, 2012 until February 4, 2016, is in fact explained by Plaintiff's performance problems, a factor other than sex. *See Casalina*, 708 F. App'x at 941-43 (citing *Riser*, 776 F.3d at 1196); *Mickelson*, 460 F.3d at 1312.

Because Defendant has unequivocally demonstrated that the pay disparity

experienced by Plaintiff, both due to Defendant's initial removal of Plaintiff's plus rate

and due to Defendant's subsequent refusals to pay Plaintiff a plus rate, was based on a

factor other than sex, the Court will grant Summary Judgment to Defendant on

Plaintiff's EPA claim.

> **B. THE COURT GRANTS DEFENDANT SUMMARY JUDGMENT ON PLAINTIFF'S TITLE VII SEX DISCRIMINATION CLAIM, BECAUSE EVEN THOUGH PLAINTIFF MAKES A *PRIMA FACIE* SHOWING OF DISCRIMINATION, DEFENDANT HAS SUCCESSFULLY DEMONSTRATED THAT PLAINTIFF'S PAY DIFFERENTIAL WAS BASED ON HER PERFORMANCE PROBLEMS, AND PLAINTIFF FAILS TO SHOW THAT THIS BASIS IS MERE PRETEXT.**

In count two of her Complaint, Plaintiff brings an equal pay claim under Title

VII, alleging discrimination on the basis of sex. *Doc. 1* at 8-10. Under Title VII, it is

unlawful for an employer "to discriminate against any individual with respect to [her]

compensation, terms, conditions, or privileges of employment, because of such

individual's…sex[.]" 42 U.S.C. § 2000e-2(a)(1). Here, Plaintiff claims that "Defendant,

through its managers and officials, discriminated against Plaintiff based on sex (female)

by unlawfully withholding the 12.5% LR rate pay during each pay period from March 5,

2010 through February 2016." *Doc. 1* at 8.

Under Title VII, "a plaintiff bears the ultimate burden of proving her employer

intentionally discriminated against her" by means of either direct or circumstantial

evidence. *Bennett v. Windstream Commc'ns, Inc.*, 792 F.3d 1261, 1266 (10th Cir. 2015)

(citing *Riser*, 776 F.3d at 1199; *Adamson v. Multi Cmty. Diversified Servs., Inc.*, 514 F.3d

1136, 1145 (10th Cir. 2008)). *See also Loyd v. Phillips Brothers, Inc.*, 25 F.3d 518, 525 (7th

Cir. 1994) (in a Title VII action, the plaintiff must show an intent and desire to pay women less than men based on sex); *Tidwell v. Fort Howard Corp.*, 989 F.2d 406, 410 ("even a disparate treatment finding alone is not enough under Title VII") (citing *EEOC v. Flasher Co., Inc.*, 986 F.2d 1312 (10th Cir. 1992)); *Plemer v. Parsons-Gilbane*, 713 F.2d 1127, 1136 (5th Cir. 1983) ("In a Title VII case, the burden of persuasion always remains with the plaintiff."). "Where, as here, a plaintiff seeks to use circumstantial evidence to show her employer's discriminatory intent, we employ the three-step burden-shifting framework set forth in *McDonnell Douglas*." *Bennett*, 792 F.3d at 1266 (internal citation omitted). *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Meeks*, 15 F.3d 1013, 1018-19 (11th Cir. 1994) ("We have previously held that the Supreme Court's disparate treatment cases, such as [*McDonnell Douglas*], provide 'the appropriate framework for evaluating [a] claim of gender-based wage discrimination' under Title VII.") (citation omitted).

In step one of the *McDonnel Douglas* framework, the employee must make a *prima facie* showing of sex discrimination by the employer. *Nulf v. Int'l Paper Co.*, 656 F.2d 553, 557 (10th Cir. 1981) (citing *McDonnel Douglas*, 411 U.S. at 802). If the plaintiff succeeds, the Court moves on to step two, in which the defendant must rebut the presumption of discrimination by "producing 'some evidence that it had legitimate, nondiscriminatory reasons [.]'" *Sorensen*, 984 F.2d at 352 (quoting *Watson*, 487 U.S. at 986). Finally, if the defendant succeeds in rebutting the presumption of discrimination,

then "summary judgment is warranted unless the employee can show there is a genuine issue of material fact as to whether the proffered reasons are pretextual." *Plotke*, 405 F.3d at 1099.

In making her Title VII disparate compensation claim, like her EPA claim, Plaintiff argues that the sex discrimination she experienced while employed by Defendant can be divided into two distinct categories: (1) unequal pay resulting from the removal of her plus rate on August 11, 2010 and (2) unequal pay resulting from Defendant's refusal to reinstate Plaintiff's plus rate following Plaintiff's written request on November 18, 2012. *Doc. 68* at 1-2.

1. **Plaintiff makes a *prima facie* showing of discrimination.**

Applying the *McDonnel Douglas* framework, the Court begins by determining whether Plaintiff succeeds in making out a *prima facie* case of sex discrimination. In her Complaint, Plaintiff argues that, from August 11, 2010 until February 4, 2016, TKE did not compensate Plaintiff with a plus rate for her employment as an LR in Roswell, even though "Defendant developed a practice of paying LR Service Mechanics in New Mexico, and other areas of the country, an additional 12.5% above the union scale whenever the LR Service Mechanic was required to be 'on call' on a 24/7 basis, was required to respond to client service calls within two (2) hours, and when the Mechanic's assigned route included servicing clients outside the geographic area identified in the collective bargaining agreement as the 'primary zone.'" *Doc. 1* at 3-4.

"[A] female Title VII plaintiff establishes a *prima facie* case of sex discrimination by showing that she occupies a job similar to that of higher paid males." *Sprague*, 129 F.3d at 1365 (quoting *Meeks*, 15 F.3d at 1019). *See also Baumgardner v. ROA General, Inc.*, 864 F. Supp. 1107, 1111 (D. Utah 1994); *Lowe v. New Mexico ex rel. King*, 2014 WL 12796841, at *4 (D.N.M. March 28, 2014) (unpublished) (quoting *Johnson v. Weld County, Colo.*, 594 F.3d 1202, 1215 (10th Cir. 2010)); *Casalina v. Moniz*, 2016 WL 7486190, at * 9 (D.N.M. Oct. 27, 2016) (unpublished). "Title VII incorporates a more relaxed standard of similarity between male and female-occupied jobs, thus plaintiff is not required to meet the exacting standard of substantial equality of positions set forth in the Equal Pay Act." *Miranda v. B& B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1529 n.15 (11th Cir. 1992); *see also Lowe*, 2014 WL 12796841, at *5 ("the question is not whether [the plaintiff's] work is equal to that of a higher paid male, but whether or not [the plaintiff] has shown sufficient similarity between the work she performed … and that of the male comparators"). Applying the "job similarity" standard, the Court finds that Plaintiff's position as an LR in Roswell is similar to the work performed by all male TKE LRs. Each LR works as an elevator mechanic outside the primary zone, is on call 24/7 with limited exceptions, and must respond promptly to call-backs. *See generally doc. 54-10*. *See also Miranda*, 975 F.2d at 1529 n.15. Furthermore, there has been no allegation that LR positions other than Plaintiff's are more stressful or demanding, or require greater

skills, knowledge or expertise.[19]  As a result, the Court finds that Plaintiff's position was similar to the positions held by every male LR employed by TKE nationwide.  Plaintiff has also established that male LRs throughout the United States, including her predecessor and successor, were generally higher-paid than Plaintiff.  *See doc. 54-36.*[20] Therefore, the Court finds that Plaintiff has presented sufficient evidence to make out a *prima facie* sex discrimination case under Title VII.

> 2. **Defendant rebuts Plaintiff's *prima facie* case by demonstrating a legitimate, nondiscriminatory reason for Plaintiff's pay discrepancy.**

Moving to step two of the *McDonnell Douglas* test, Defendant must now rebut the presumption of discrimination by "producing 'some evidence that it had legitimate, nondiscriminatory reasons for the decision [not to pay Plaintiff a plus rate.]'"  *Sorensen*, 984 F.2d at 352 (quoting *Watson*, 487 U.S. at 986).  This "burden is exceedingly light," requiring Defendant only to "provide admissible evidence of a legally sufficient explanation for the [pay discrepancy] that raises a genuine issue of material fact as to whether [Defendant] discriminated against [Plaintiff.]"  *DePaula*, 859 F.3d at 970 (citations and quotations omitted).  In addition, we do not consider "whether [Defendant's] proffered reasons were wise, fair, or correct, but whether [it] honestly

---

[19] The Court emphasizes that it compares the expectations of the positions, generally, rather than the performance of the individual employees, particularly.
[20] However, as noted previously, TKE did not pay a plus rate to various male LRs, including male LRs employed in Local 131.  *See doc. 54-36*.

believed those reasons and acted in good faith upon those beliefs." *Rivera*, 365 F.3d at 924-25.

Here, Defendant presents affirmative defenses identical to those made in response to Plaintiff's EPA claim, and the Court incorporates them herein. *See doc. 54-1* at 26-30 (addressing Plaintiff's EPA, Title VII and FPWA pay discrimination claims simultaneously). To summarize, first, Defendant explains that the removal of Plaintiff's plus rate was made pursuant to a term included in the settlement agreement that reinstated Plaintiff following her termination, a term whose inclusion was motivated by Plaintiff's performance problems prior to her termination. Second, Defendant contends that Defendant refused Plaintiff's requests to reinstate her plus rate because her performance problems continued.[21]

Poor performance is a legitimate, non-discriminatory reason for dissimilar treatment, including a pay differential. *See Chytka v. Wright Tree Service, Inc.*, 925 F. Supp. 2d 1147, 1167 (D. Colo. 2013) (the plaintiff's unsatisfactory work performance and negative relations with the defendant's largest customer were legitimate non-discriminatory reasons for the plaintiff's termination); *Palmer v. Kaiser Foundation Hospitals*, 2017 WL 8894648, at *6-7 (D. Colo. 2017) (slip opinion) (the defendant presented a legitimate nondiscriminatory reason for terminating Plaintiff where

---

[21] For a detailed explanation of Plaintiff's performance issues throughout her employment with TKE, see the EPA affirmative defense analysis. *See supra* pp. 22-29.

"Plaintiff had difficulty performing her job duties throughout her employment [and] Plaintiff's initial supervisor, reported … that Plaintiff's performance 'was particularly weak' and that 'she struggled to demonstrate the behaviors and skills considered critical,'" and "[i]n spite of … weekly meetings … to track Plaintiff's progress, Plaintiff continued to fail to meet the expectations of her position.").

The Court finds that Defendant has provided abundant admissible evidence demonstrating that Plaintiff's performance at TKE was unsatisfactory, justifying the initial removal of her plus rate[22] and the refusal to reinstate her plus rate thereafter.[23]

3. **Plaintiff fails to create a genuine issue of material fact as to whether Defendant's reasons for her pay discrepancy were pretextual.**

The Court now turns to step three of the *McDonnell Douglas* test, in which "summary judgment is warranted unless [Plaintiff] can show there is a genuine issue of material fact as to whether the proffered reasons are pretextual." *Plotke*, 405 F.3d at 1099. "A plaintiff shows pretext by demonstrating 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate

---

[22] *See, e.g., doc. 54-15* at 1 (unsatisfactory performance letter from Doug Roach memorializing Plaintiff's disastrous service visit at Eastern New Mexico University prior to her termination); *doc. 54-16* (Plaintiff's unsatisfactory performance evaluation); *doc. 54-13* (Plaintiff's termination letter).

[23] *See, e.g., doc. 54-22* (unsatisfactory performance letter from Gary Dodd describing Plaintiff's poor customer relations skills, inadequate office communications, rule breaking, and lateness); *doc. 54-24* (unsatisfactory performance letter from James Jasinski underscoring that Plaintiff's poor interactions with clients had caused Defendant to lose a customer); *doc. 54-23* (training documents evidencing that Plaintiff failed to meet company expectations, even after months of specialized training); *doc. 54-25* (customer letter complaining about Plaintiff's services); *docs. 54-26, 54-27* (two unsatisfactory performance letters from Carlos Trujillo for working unauthorized overtime); *doc. 54-29* (emails discussing Plaintiff's frequent work absences and the loss of a TKE customer due to Plaintiff's unprofessional interactions with the client).

reasons for its action that a reasonable factfinder could rationally find them unworthy of credence' and hence infer that the employer did not act for the asserted nondiscriminatory reasons." *Swackhammer*, 493 F.3d at 1167 (quoting *Plotke*, 405 F.3d at 1102).

Plaintiff attempts to show pretext by arguing disparate treatment—particularly, that "she was subjected to different discipline [a reduction in her pay] than other employees who committed the same or more serious offenses." *Chytka,* 925 F. Supp. 2d at 1167 (citations omitted); *see doc. 55* at 17-18. "Under this approach, a plaintiff can establish pretext by 'demonstrat[ing] that the employer treated the plaintiff differently from other similarly-situated employees[.]'" *Herrera v. United Airlines, Inc.*, 2018 WL 5257501, at *5 (10th Cir. 2018) (unpublished) (quoting *Swackhammer*, 493 F.3d at 1167-68). "Similarly situated employees are those who deal with the same supervisor and are subject to the same standards governing performance evaluation and discipline." *Wilson*, 1996 WL 50462, at *1 (10th Cir. Feb. 7, 1996) (unpublished) (citing *Mazzella v. RCA Global Communications, Inc.*, 642 F. Supp. 1531, 1547 (S.D.N.Y.1986), *aff'd*, 814 F.2d 653 (2d Cir.1987)); *see also Aramburu v. Boeing Co.*, 112 F.3d 1398, 1404 (10th Cir. 1997). However, outside of that evidence stricken from the record pursuant to the Court's order granting Defendant's Motion to Strike, *doc. 70,* Plaintiff has not presented any evidence that TKE employed any other employee who suffered from a pattern of

performance issues comparable to her own but nevertheless retained his plus rate.[24]

Plaintiff seeks to explain the absence of evidence of a comparably struggling and disciplined male employee by stating that Defendant sought out complaints about Plaintiff, worked to make Plaintiff fail, and created instances where Plaintiff was not able to perform. *Doc.* 68 at 5. For the most part, Plaintiff provides no evidence of these assertions. One piece of evidence to which she does cite is an email from Mr. Upchurch that states, "[i]t appears to me that enough has gone on with [Plaintiff's] performance that we need to…deal with the situation…We have to tread carefully with [Plaintiff] as you know and be mindful of the fact that she can and most likely will file a claim based on retaliation as we begin to deal with her performance. On that point, we need to be careful that we are not 'soliciting' comments or letters from our Customers unless they bring the issue to our attention-make sense?" *Doc. 54-21* at 6. This email does not bear the weight Plaintiff places on it. It explicitly directs the supervisory chain not to target Plaintiff. While the Court in a summary judgment posture does not accept this email as proof that Defendant did not target Plaintiff, it certainly is not evidence of the contrary. Beyond that email, Plaintiff points to no evidence that Defendant solicited complaints about Plaintiff from its customers. Nevertheless, Defendant received complaints

---

[24] Plaintiff, in an additional effort to show pretext, underscores that the only other female LR employed in Local 131, Teresa Yeager, had her plus rate red-circled in 2010 such that her salary returned to union scale in 2015, even though her brother filled the same position in 2015 and received a plus rate immediately. *Doc. 68* at 5. However, it is undisputed that Ms. Yeager's plus rate was removed for performance issues not shared by her brother. *Id.*

including comments such as "[w]hat is wrong with [Plaintiff]? Please give us a little notice for the sake of both our guests and our employees[,]"describing interactions with Plaintiff as a "very frustrating and unprofessional experience[,]" and expressing that they, in hindsight would rather continue to deal with a malfunctioning elevator than have Plaintiff try to fix it. *Doc. 54-21* at 3-4; *doc. 54-25* at 2. The Court therefore finds that because Plaintiff has failed to provide evidence tending to establish that Defendant's proffered nondiscriminatory reason for her termination was pretextual, there is no genuine issue of material fact. As a result, the Court will grant Summary Judgment to Defendant on Plaintiff's Title VII sex discrimination claim.

   **C.** **THE COURT GRANTS DEFENDANT SUMMARY JUDGMENT ON PLAINTIFF'S TITLE VII RETALIATION CLAIM BECAUSE PLAINTIFF'S *PRIMA FACIE* CASE FAILS, AND BECAUSE EVEN IF PLAINTIFF HAD SUCCESSFULLY MADE A *PRIMA FACIE* CASE, DEFENDANT ESTABLISHED THAT PLAINTIFF'S PAY DIFFERENTIAL WAS BASED ON HER POOR PERFORMANCE, AND PLAINTIFF FAILS TO SHOW THAT THIS BASIS IS MERE PRETEXT.**

In count two of her Complaint, Plaintiff also brings a Title VII retaliation claim. *Doc. 1* at 8-10. Title VII states, "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees … because [s]he has opposed any practice made an unlawful employment practice by this subchapter, or because [s]he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C.A. § 2000e-3.

Here, Plaintiff asserts that Defendant retaliated against her for two reasons.

First, Plaintiff claims that Defendant retaliated against her for "filing a complaint against Defendant"[25] by removing her plus rate upon reinstatement on August 11, 2010 and refusing to pay Plaintiff a plus rate when she submitted a written request on November 18, 2012. *Doc. 1* at 9-10. Second, Plaintiff alleges that Defendant retaliated against her for requesting plus rate reinstatement on November 18, 2012 by refusing the request. *Doc 1* at 9; *doc. 55* at 19-20; *doc. 68* at 1-2.[26]

When addressing a Title VII retaliation claim, as with a Title VII sex discrimination claim, the Court applies the burden shifting framework of *McDonnell Douglas*. Meaning, Plaintiff must first make a *prima facie* showing of retaliation by Defendant. *Argo v. Blue Cross Blue Shield of Kansas, Inc.*, 452 F.3d 1193, 1202 (10th Cir. 2007). If she succeeds, Defendant must then rebut the presumption of retaliation by "articulat[ing] a legitimate, nondiscriminatory reason for the [adverse action.]" *Id*. Finally, if Defendant succeeds, "the burden shifts back to [Plaintiff] to demonstrate that the proffered explanation is a pretext for retaliation." *Id*. at 1203.

---

[25] The "complaint" to which Plaintiff refers is the April 16, 2010 grievance that Plaintiff filed with the New Mexico Department of Workforce Solutions/Human Rights Bureau and EEOCC, alleging wrongful termination and sex/sexual orientation discrimination. *Doc. 1* at 2, 4. Although Plaintiff filed additional charges with the New Mexico Department of Workforce Solutions and the EEOC on January 3, 2014, Plaintiff does not allege that these charges are the basis of any retaliatory actions by Defendant following January 3, 2014. *See doc.* 55 at 20-22.

[26] In her Complaint, Plaintiff also argues, "Defendant retaliated against Plaintiff in disparately terminating her without justification." *Doc. 1* at 10. However, the Settlement Agreement of August 11, 2010 wholly addressed Plaintiff's termination claims. *See doc. 54-14* at 1 ("This is an Agreement and General Release … to forever resolve and settle any and all disputes arising out of [Plaintiff's] termination and reemployment by the Company"). Therefore, Plaintiff cannot relitigate this issue.

1. **Plaintiff fails to make a *prima facie* case of retaliation.**

To establish a *prima facie* claim of retaliation, a plaintiff must demonstrate "(1) that [s]he engaged in protected opposition to discrimination, (2) that a reasonable employee would have found the challenged action materially adverse, and (3) that a causal connection existed between the protected activity and the materially adverse action." *Wal-Mart Stores*, 576 F. Supp. 2d at 1243 (quoting *Argo*, 452 F.3d at 1202).

a. **Plaintiff fails to make a *prima facie* case of retaliation in response to her filing of grievances.**

First, Plaintiff claims that Defendant retaliated against her for filing complaints with the New Mexico Department of Workforce Solutions/Human Rights Bureau and EEOC on April 16, 2010. *Doc. 1* at 8-10. Turning to the first prong of the *prima facie* test, Defendant does not dispute that Plaintiff's filing of complaints with the New Mexico Department of Workforce Solutions/Human Rights Bureau and EEOC, alleging wrongful termination and sex/sexual orientation discrimination, constituted "protected opposition to discrimination." *See doc. 54-1* at 30. *See also Martinez v. Henderson*, 252 F. Supp. 2d 1226, 1235 (D.N.M. 2002) ("it is undisputed that Plaintiff engaged in protective activity by filing. . .EEO charges").

In addressing the second prong, the Court must determine whether Defendant's alleged retaliatory conduct in response to Plaintiff's grievance, including removal of Plaintiff's plus rate and refusal to reinstate Plaintiff's plus rate, constitutes adverse employment action.

> The Supreme Court has defined an "adverse employment action" as one that "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761, 118 S. Ct. 2257, 141 L. Ed. 2d 633 (1998). The Tenth Circuit liberally interprets the term "adverse employment action" and takes a case-by-case approach in determining whether a given employment action is "adverse." *Jeffries v. Kansas*, 147 F.3d 1220, 1231-32 (10th Cir. 1998).

*Martinez*, 252 F. Supp. 2d at 1235. To begin, the Court will address whether the removal of Plaintiff's plus rate upon reinstatement of her employment was an "adverse employment action." Defendant argues that the removal of Plaintiff's plus rate upon reinstatement was not an adverse employment action, because Defendant enacted this removal pursuant to Plaintiff's voluntary settlement agreement. *Doc. 54-1* at 31. Particularly, Defendant contends that the removal of Plaintiff's plus rate, a singular term, cannot be considered independently from the settlement agreement in its entirety, whose overall benefits, including a $30,000 payment, removal of discipline letters from Plaintiff's file, and reinstatement of Plaintiff's employment, could not be characterized as "adverse" by a reasonable person. *Id.*

The Court agrees that the context in which Defendant removed Plaintiff's plus rate impacts the case-by-case "adverse employment action" analysis. *See Jeffries*, 147 F.3d at 1231-32. Here, Plaintiff's plus rate was not removed during the ordinary course of employment. This is not a case where a plaintiff, currently employed by an employer, filed a grievance and subsequently suffered a reduction in pay. Instead,

Defendant terminated Plaintiff on March 5, 2010, Plaintiff filed grievances over a month later, and several months thereafter, Defendant rehired Plaintiff, pursuant to an agreement in which Plaintiff accepted a reduced salary as a condition of reinstatement. Plaintiff's argument that the removal of her plus rate, as a condition of reinstatement, constituted an adverse employment action ignores the fact that the parties negotiated and agreed upon the August 2010 settlement agreement. In addition, her argument, by characterizing Plaintiff's reinstatement at reduced pay as punishment, also assumes that Plaintiff was entitled to employment at the union rate augmented by the plus rate, a supposition that requires the Court to ignore Plaintiff's *status quo ante*. On the contrary, Plaintiff's reinstatement at a reduced pay *improved* her status from unemployed to employed. Therefore, in consideration of the foregoing, the Court finds that the removal of Plaintiff's plus rate, as a term of Plaintiff's reinstatement, cannot be properly considered an adverse employment action.

The Court moves on to the second allegedly adverse action: refusal to reinstate Plaintiff's plus rate. Even assuming, without deciding, that the refusal to reinstate Plaintiff's plus rate could be characterized as adverse, Plaintiff's *prima facie* case under this theory fails to meet the third prong – showing a causal connection existed between the filing of Plaintiff's complaints and the refusal to reinstate Plaintiff's plus rate. "A causal connection may be shown by 'evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action.'"

*O'Neal*, 237 F.3d at 1253 (quoting *Burrus,* 683 F.2d at 343).  Here, Plaintiff relies on temporal proximity alone to prove causation.  *See doc. 55* at 21.  However, the protected activity and the adverse employment action are not remotely close in time.  Plaintiff filed her grievances in April of 2010, and Defendant refused to reinstate Plaintiff's plus rate on some unspecified date following November 18, 2012.  "Unless there is very close temporal proximity between the protected activity and the retaliatory conduct, the plaintiff must offer additional evidence to establish causation."  *O'Neal,* 237 F.3d at 1253 (noting that the Tenth Circuit has held that a one and one-half month period between the protected activity and the adverse action may, alone, establish causation, but that a three-month period, standing alone, is insufficient).  Without more, therefore, Plaintiff does not demonstrate the existence of a causal link between the filing of Plaintiff's grievances against Defendant and Defendant's refusal to reinstate Plaintiff's plus rate over two years later.  As a result, Plaintiff's *prima facie* case premised on retaliation for the 2010 grievances fails.

> **b.  Plaintiff fails to make a *prima facie* case of retaliation in response to her request for plus rate compensation.**

Second, Plaintiff claims that Defendant retaliated against her for making a written request to have her plus rate reinstated by denying the request.  *Doc. 1* at 8-10.  Turning to the first prong of the *prima facie* test, Defendant does not dispute that Plaintiff's request that she be compensated a plus rate like her male colleagues constituted "protected opposition to discrimination."  However, the Court finds that

Plaintiff fails to make out a *prima facie* case of retaliation on this basis, because Defendant's refusal to reinstate Plaintiff's plus rate was not an adverse employment action.

To reiterate, an adverse employment action is one that results in "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Ellerth,* 524 U.S. at 761. When Plaintiff requested on November 18, 2012 that she be compensated with a plus rate, her salary did not include a plus rate. Therefore, Defendant's decision not to pay Plaintiff a plus rate did not cause Plaintiff to experience a "significant change in employment status." *Id.* Rather, her employment status remained constant. As a result, Plaintiff suffered from no adverse employment action, and Plaintiff's *prima facie* case consequently fails.

2. **Even if Plaintiff had made out a successful *prima facie* case of retaliation, Defendant has demonstrated that it had a legitimate nondiscriminatory basis for removing and refusing to reinstate plaintiff's plus rate, and Plaintiff makes no showing that that this reason is pretextual.**

In response to Plaintiff's Title VII retaliation claim, Defendant presents affirmative defenses identical to those made in response to Plaintiff's EPA and Title VII sex discrimination claims, and the Court incorporates them herein. *See doc. 54-1* at 26-30. To summarize, first, Defendant explains that the removal of Plaintiff's plus rate was made pursuant to a term included in the settlement agreement that reinstated Plaintiff,

45

a term whose inclusion was motivated by Plaintiff's performance problems. Second, Defendant contends that Defendant refused Plaintiff's requests to reinstate her plus rate because her performance problems continued.[27]

Poor performance is a legitimate, non-discriminatory reason for an employer to engage in adverse employment actions. *See Chytka*, 925 F. Supp. 2d at 1167 (employee terminated for poor performance); *Palmer*, 2017 WL 8894648, at *6-7 (same). Here, the Court finds that Defendant has provided copious evidence demonstrating that Plaintiff's performance at TKE was substandard.[28] Furthermore, Defendant has demonstrated that it had a general practice of removing the plus rates of LRs whose performance was substandard.[29] In sum, Defendant shows that it removed and refused to reinstate Plaintiff's plus rate because of her performance problems, and not because Plaintiff filed a grievance against TKE or requested a salary increase.

The Court now turns to step three of the *McDonnell Douglas* test, which requires Plaintiff to show that Defendant's reasons for its adverse treatment of Plaintiff were pretextual. *Plotke*, 405 F.3d at 1099. Plaintiff attempts to show pretext by arguing that "she was subjected to different discipline [a reduction in her pay and a refusal to reinstate it] than other employees who committed the same or more serious offenses."

---

[27] For a detailed explanation of Plaintiff's performance issues throughout her employment with TKE, see the EPA affirmative defense analysis, *supra* pp. 22-29.

[28] *See supra* notes 27, 28.

[29] *See supra* note 13.

*Chytka,* 925 F. Supp. 2d at 1167 (citations omitted); *see doc. 55* at 17-18.  However,  as explained above,[30] Plaintiff has failed to present any admissible evidence that would indicate the existence of a similarly situated employee who suffered from a pattern of performance issues comparable to her own, but nevertheless retained his plus rate, and has also failed to demonstrate that Defendant intentionally sought to thwart Plaintiff's success.  The Court therefore finds that, even if Plaintiff had established a *prima facie* case, her retaliation claim nevertheless fails, because Plaintiff has not provided evidence tending to establish that Defendant's proffered nondiscriminatory reason was pretextual.  As a result, the Court will grant Summary Judgment to Defendant on Plaintiff's Title VII retaliation claim.

### D. THE COURT DECLINES TO EXERCISE SUPPLEMENTAL JURISDICTION OVER PLAINTIFF'S FWPA CLAIM AND WILL DISMISS IT WITHOUT PREJUDICE.

As explained above, the Court has dismissed all Plaintiff's federal claims.  The only claim remaining is the Third Claim of her Complaint which alleges a violation of the FPWA, which "prohibits employers from paying an employee less than someone of the opposite sex when they are performing the 'same work.'"  *Doc. 1* at 10.  Specifically, Plaintiff alleges that this pay discrimination claim arises from Defendant's refusal to reinstate Plaintiff's plus rate beginning on June 14, 2013.  *Doc. 68* at 4.[31]

---

[30] *See supra* pp. 38-39.
[31] Plaintiff does not seek to recover for any alleged discrimination prior to June 14, 2013 under the FPWA, because the FPWA only became effective in New Mexico on that date.  NMSA § 28-23-3.

The basis for this Court's jurisdiction over Plaintiff's Complaint was federal question. *See doc. 2-1.* Consequently, a ruling over Plaintiff's FPWA claim would be an exercise of supplemental jurisdiction. *See* 28 U.S.C. § 1367. The Court may decline to exercise supplemental jurisdiction over a state law claim if (1) the claim raises a novel or complex issue of state law, (2) the claim substantially predominates over the federal claims in the case, (3) the district court has dismissed all claims over which it has original jurisdiction, or (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction. *Nielander v. Bd. of Cty. Comm'rs of Cty. of Republic, Kan.*, 582 F.3d 1155, 1172 (10th Cir. 2009) (citing the factors set forth in 28 U.S.C. § 1367(c)). In the Tenth Circuit, when the third above-listed scenario arises, courts "may, and usually should, decline to exercise jurisdiction over any remaining state claims." *Smith v. City of Enid City Comm'n*, 149 F.3d 1151, 1156 (10th Cir. 1998). Further, the Court must consider the principles of "judicial economy, convenience, fairness, and comity" in determining whether it is appropriate to exercise supplemental jurisdiction. *Nielander*, 582 F.3d at 1172 (quoting *Carnegie–Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988)). Ultimately, whether to exercise supplemental jurisdiction is a decision left to the Court's discretion. *City of Chi. v. Int'l Coll. of Surgeons*, 522 U.S. 156, 172–73 (1997); *see also Salazar v. San Juan Cty. Det. Ctr.*, 301 F. Supp. 3d 992, 1001 (D.N.M. 2017) ("In circumstances where the supplemental jurisdiction statute may support supplemental jurisdiction, the district court retains discretion to decline to exercise that jurisdiction.").

As noted above, the FPWA and the EPA are very similar with one important exception. The three affirmative defenses available under the FPWA – differences are explained by a "seniority system," a "merit system," or a "system that measures earnings by quantity or quality of production – are identical to affirmative defenses under the EPA. 29 U.S.C. § 206(d)(1); *compare* NMSA § 28-23-3. However, the FPWA does not incorporate the "catch-all" exception included in the EPA. See 29 U.S.C. § 206(d)(1) (providing defense for "a differential based on any other factor other than sex"). This omission is particularly important here because Defendant's EPA defense, which has been accepted by the Court, is based upon the EPA's catch-all exception. *See e.g. Casalina*, 708 F. App'x at 941 (employer's "pay-for-performance system" constituted a factor other than sex under the catch-all exception to the EPA); *Brownlee*, 642 F. Supp. at 362 (holding that, because the defendant based its salary program on "performance[, t]he salary system clearly was based on *factors other than sex* … thus falling within the fourth exemption … to the Equal Pay Act."). For the purposes of the FPWA, Defendant argues that Plaintiff's performance problems satisfy the "merit system" affirmative defense. *Doc. 56* at 5; *doc. 68* at 4. Consequently, Defendant argues the pay disparity was based on a "merit system," the second affirmative defense under the FPWA. *Id.*

As Defendant itself notes, federal case law provides guidance on analogous New Mexico state law claims. *See doc. 54-1* at 17, n.9 (citing *Juneau v. Intel Corp.*, 139 N.M. 12, 15 (2005)). Indeed, federal courts have indicated an inclination to analyze the FPWA

under the rubric of the federal Equal Pay Act (EPA) given the statutes' similarity.  *See,*

*e.g., Burke v. New Mexico*, 696 F. App'x 325, 333 (10th Cir. 2017); *Gonzales v. Cty. of Taos*,

2018 WL 3647206, at *13 (D.N.M. Aug. 1, 2018) (slip copy).  Under this approach, given

the lack of reported cases on the meaning of "merit system" under the FPWA, the Court

would look to the interpretation of that defense under the EPA.

Every circuit court which has interpreted this provision has concluded that, for a

"merit system" to qualify as an affirmative defense under the EPA, it "must be an

organized and structured procedure whereby employees are evaluated systematically

according to predetermined criteria."  *Ryduchowski v. Port Authority of N.Y. and N.J.*, 203

F.3d 135, 143 (2d Cir. 2000) (*citing EEOC v. Aetna Ins. Co.*, 616 F.2d 719, 725 (4th Cir.

1980)); *see also Thomas v. United States*, 351 F. App'x 433, 435 (Fed. Cir. 2009)

(unpublished) (citing with approval *Raymond v. United States*, 31 Fed. Cl. 514, 518-19

(Fed. Cl. 1994)); *Fisher v. Conrad*, 1993 WL 20184 (6th Cir. Jan. 29, 1993) (unpublished);

*Maxwell v. City of Tucson*, 803 F.2d 444, 447 (9th Cir. 1986); *Morgado v. Birmingham-*

*Jefferson County Civil Defense Corps*, 706 F.2d 1184, 1188-89 (11th Cir. 1983).  "Moreover,

employees must be aware of the merit system and the merit system must not be gender

based."  *Ryduchowski*, 203 F.3d at 143.  Finally, employers who implement such "bona

fide job evaluation plans" must, to succeed under the second affirmative defense to the

EPA, demonstrate that the employer's merit system caused the alleged wage disparity.

*See Corning Glass Works*, 417 U.S. at 201.

If "merit system" means the same under the FPWA as it does under the EPA,

Defendant's motion for summary judgment on the FPWA claim would be denied on

this record.  Defendant provides insufficient evidence to demonstrate that its plus rate

decisions were based on "an organized and structured procedure whereby employees

are evaluated systematically according to predetermined criteria." *See, e.g., Flory v. Salt*

*Lake County Sheriff's Office*, 680 F. Supp. 1504, 1506 (D. Utah 1988).  Rather, the evidence

demonstrates that Defendant, on occasion, removed the plus rates of employees as a

spontaneous disciplinary action,[32]  and calculated, introduced or negotiated plus rates

at its discretion, for a variety of reasons, on a case-by-case basis.  Specifically, Mr.

Upchurch explains that Defendant generally considers various factors when

determining whether and how much to compensate an LR with a plus rate.  *Doc. 54-4* at

13.  He notes that he does not have firsthand knowledge of why and how decisions are

made, even though under a "merit system," even an employee must be aware of the

system.  *Id.*  However, he speculates that it may be due to "what's happening in the

market and the economic conditions and all those sorts of things[,]"revealing that,

based on his understanding, Defendant's  general salary-determination system is not

---

[32] For example, the evidence reveals that Defendant removed the plus rates of individual employees spontaneously on November 23, 2009, August 9, 2010, April 26, 2011, and June 11, 2012 to quickly address diverse employee issues.  *Doc. 54-37*.  Defendant removed these plus rates upon discovery of the particular employee misconduct, rather than following a systemic review of all employees.  *Id.*  This use of a "carrot and stick" approach by Defendant to confront various factors other than sex that might affect an employee's performance, while appropriate under the "catch-all" provision, cannot be said to create wage disparities based solely upon a merit system.

purely a merit system. *Id.* Mr. Dodd's testimony similarly indicates that Defendant relies on a flexible and discretionary system to determine pay. When asked why plus rates are given to certain LRs, Mr. Dodd explained, "if somebody is a high performer and you're trying to move them into that area to improve your business, you might negotiate a higher rate with them, or you could have an area where there's no way you can get anybody to live there…they might negotiate…plus rates…to try to get a person supporting your business in that location." *Doc. 54-5* at 29.

Consequently, there is insufficient evidence in the record that Defendant's performance reviews of Plaintiff specifically or its plus-rate decisions more generally were part of a "merit system" as that term is understood under the EPA. Of course, it is possible that "merit system" under the FPWA, given its lack of a catch-all exception, should be read more broadly than the same term in the EPA. As Defendant notes, the FPWA provides a cause of action for wage "discriminat[ion] between employees on the basis of sex." NMSA § 28-23-3. Perhaps this fundamental requirement means that a "differential based on any other factor other than sex" would not create liability under the FPWA. Indeed, it would seem peculiar that undeniable performance problems would not serve as a legitimate basis for a wage difference simply because the performance problems were not addressed as part of an "organized and structured procedure whereby employees are evaluated systematically according to predetermined criteria." *Ryduchowski*, 203 F.3d at 143. Nonetheless, if the language of

the FPWA is interpreted identically to the corresponding language in the EPA, such a result becomes possible.  *See also Nixon v. State*, 96 Md. App. 485, 496-498 (Ct. App. Md. 1993) (interpreting Maryland equal pay statute which lacks EPA "catch-all" defense to require defense based on performance to satisfy rigorous EPA "merit system" standard).  In short, the breadth of the protections of the FPWA and its "merit system" defense are novel questions of state law which are (at least on this record) dispositive of Defendant's motion for summary judgment on the FPWA.

Having dismissed all federal claims in this matter and found that the remaining claim raises a novel issue of state law, the Court declines to exercise jurisdiction over the remaining state law claim.  Therefore, the Court will dismiss Plaintiff's FPWA claim without prejudice.  *See Ball v. Renner*, 54 F.3d 664, 669 (10th Cir. 1995) ("[T]he most common response to a pretrial disposition of federal claims has been to dismiss the state law claim or claims without prejudice….").

## V.    CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment (*doc. 54*) is GRANTED in part and Denied in part.  Plaintiff's claims under the EPA and Title VII are hereby DISMISSED WITH PREJUDICE.  Plaintiff's claim under the FPWA is hereby DISMISSED WITHOUT PREJUDICE.

**IT IS SO ORDERED**.

_____
GREGORY B. WORMUTH
United States Magistrate Judge
**Presiding by Consent**